Appeal of the Court of Arbitration May it please the Court, my name is Ashley Tomlinson and I am present today on behalf of the appellant Lisa Phillips, who is the mother of the child that is the subject of this appeal. The question before this Court today is whether the District Court erred when it found that the child was habitually residing in Paraguay at the time of the alleged abduction in October 2016. The answer to that question is yes, for two reasons. First, the District Court applied the wrong legal standard for determining habitual residence. The District Court failed to conduct the necessary threshold analysis of whether the parties reached an explicit meeting of the minds to abandon their daughter's habitual residence in the United States, there could be no habitual residence in Paraguay. Second, once you apply the correct legal standard, the undisputed facts of this case cannot satisfy Mr. Cartes' burden to prove a meeting of the minds to abandon the United States as the habitual residence. So you say there's both clear error and legal error? Yes, Your Honor. But taking those in account, did the undisputed father testify? Yes, he did hear the mother and the father. And the father said Lisa agreed Paraguay would be home? That was his testimony. And then the District Court credited his testimony? Yes, but whether you, regardless of the credibility determinations of the trial court. There was legal error? There was legal error. So then really the second point collapses into the first. So your argument that there's legal error is, I saw one of two that you could make. You're saying a shared intent to make Paraguay home is not equivalent to shared intent to abandon the U.S.? What's your best authority for that? That it isn't sort of the functional equivalent? Our best authority on that is Larbee v. Larbee. In Larbee v. Larbee, this court held, this court reversed the trial court's finding that there was a change of habitual residence. And in that district court's findings and in its order, it found that it was the shared intent of the parties for the child to reside in the United Kingdom. And this court reversed because the district court failed to conduct the threshold analysis of abandonment. And this court in Berzowski v. Ojeda, Larbee v. Larbee, Delgado v. Asuna, treats abandonment as a distinct analysis of its own. And the reason it is a distinct analysis of its own and it can't be inferred from a trial court's finding that there was, that the child was living in the country, was because this court has explicitly held that the mere fact that a parent consented for a child to move to a country does not prove that they shared the necessary intent to make that new location the child's habitual residence. And that despite a significant amount of time in a new country, parents have not established a new habitual residence. But that's, that's, yes, other circuits and courts say, we disapprove of other courts' focus on relocation factors. It can't be the child over time baptized a school doctor, therefore, that's the habitual residence. But it seemed to me this district judge was saying they had a shared intent somewhere around October of 2015 to make Paraguay home. And that's Lisa's word. Well, how could you make another country your home without having an intent to abandon any other home? Because, and first of all, in this case, the court didn't conduct the full abandonment analysis in looking at the context of the case. And the district court repeatedly held that the plans, the party's plans, didn't matter. The plans weren't relevant. And in this case, and in all Hague cases, when parents disagree as to... So what should he have done that he didn't do, the trial judge? The court should have looked at the full context of this case. Because when parties disagree as to what their child's habitual residence is, the court cannot look at the representations of the parties and give them their face value. Regardless of a credibility finding, you cannot take the representations of the parties at their face value. You have to look at... If both parties took the witness stand and said, we intend to make Paraguay... If they both took the witness stand and said that, the court can't take that at face value? If it's uncontested and habitual residence is uncontested, then it's not an issue for determination. But when the parents disagree, the court has to look at the full context. And in this case, the context was a history of marital instability that predated the... But every one of these cases has marital instability. The parties... That's why these cases exist. There's marital discord. So your proposition is that in every one of these cases, it's a context rule? There is a context rule. And... What's your case for the context rule? In Berezowski v. Ojeda, this court said that the court cannot look at the representations of the parties. Instead, you have to look at the context. And in Berezowski v. Ojeda... That's another way of saying that you don't... You look at the total picture and not just the naked statements of the counsel. But what's the suggestion that the district court didn't do that? Because in this court... In this case, the court said that its ruling was based on the fact that the parties traveled to Paraguay and that they had shared intentions regarding the child's presence in Paraguay. But the court then said repeatedly that their plans prior to the move to Paraguay didn't matter. And in this case, you have discussions between the parties, written discussions, text messages, e-mails, that show since before the time of the alleged move to Paraguay in October 2016, these parties decided to divorce, that Ms. Phillips and the child were looking for an apartment in California. And even after the move to Paraguay, they continued to discuss their divorce, and they continued to discuss Ms. Phillips and the child getting an apartment in California. And at some point, Buenos Aires... These are arguments you made below, and the record also contains statements that, oh, we're happy the grandmother's going to build us a house on the property in Paraguay. And then the mother testifies and said, I wouldn't have built that house if Lisa weren't going to stay here for good. And so you credit the mother. I mean, it isn't very, very unhappy, fraught with struggle, but you've described the facts that support you, and those were facts you elicited below, but the district court ultimately credited other facts. Well, in this case, you have the fact that the apartment, Ms. Phillips kept her apartment in the United States the entire time. In addition to her testimony about the house on her property, Mr. Cortez's mother also testified that at the time that Ms. Phillips arrived in Paraguay in October 2016, that the parties were still fighting and they hadn't reconciled. But she's at the same time making hopeful statements, admittedly just stray ones, but I hope we can reconcile, hope we can make Paraguay home. And then they're both US citizens, so the husband is saying, sure, I want a place in Houston, and I sure would like one in California since my mother's going to pay for all this. Would make sense, but he says those would be visits. So if you credit all that one-sided crediting, that district court could make the conclusion, no? In this case, Mr. Cortez never established when these parties reached a meeting of the head. He says from, since before October 2015 through October 2016, they were having discussions about the possibility of moving to Paraguay. In November 2015, after the date of the alleged move to Paraguay, Mr. Cortez sends a text message to Ms. Phillips saying, if I go to the US after you, if I go back to the US, I want shared custody. And whether we live in the same countries or not, I want shared custody. And so there was this ongoing discussion, and throughout their divorce negotiations, while they were in Paraguay, they were always premised on the conclusion that Ms. Phillips and the child would be getting an apartment somewhere in the US, because her apartment in Houston, the lease was expiring, and part of the negotiations for that divorce was securing a house for her in the US. I thought she had a boyfriend by now. She did have a boyfriend in Buenos Aires, and at some point, there was discussions of her maybe... But she was also pregnant by the other boyfriend. She was. And there were some discussions about whether maybe Buenos Aires would be an option. But there was always a discussion about her getting an apartment elsewhere, and it was never in Paraguay. In October 2016...  What she was down there to do was to negotiate a divorce settlement that would allow her to have the means to... Have places all over. To set up a new house for her and her daughter in the United States. When you made the statement just a minute ago that there was never a statement by her it would be in Paraguay, is that faithful to the record? I thought there were occasional statements by her that I'd love to make Paraguay home. She uses the word home. Didn't she? I believe that was Mr. Cortez's statement. Your position, your statement is there is nothing in this record where she says, make Paraguay home? I believe she said that she wanted to... Not herself say that she wanted to make Paraguay home. That she was open to spending time there. Okay, but that could be very important because if there is a statement by her in text or email or testifying that she wanted to make Paraguay home, you're telling me that doesn't exist, that's problematic when you're telling us there's not a statement at all by her showing ever intent to make Paraguay home. Would that be very difficult for your position if that statement exists? If she said that I want to move to Paraguay and make Paraguay my home and stay there, yes. Not stay there, just there. That would be very problematic. But this court has held that you can take the steps to acclimate a child to a country. You can get a lease in a new country. You can enroll the child in daycare. But that doesn't mean that you agree to abandon the prior habitual residence. And in this case, you have the text messages in November of 2015 where Mr. Cortez says, if I go back to the U.S. with you, I won't share custody. I won't share custody whether we live in the same country or not. One argument that seemed more concerning to me, but you can pursue whichever ones you wanted, what would be the best evidence of his view that this was temporary that the district court excluded? Because there were pieces of evidence you offered that were excluded by the district court. Yes. Could you tell me what the best piece of evidence going to shared intent to abandon that you couldn't get in because the court excluded it? The best evidence that we could not get in was from that involved Mr. Cortez was his emails where he was looking for an apartment for his wife in California. District court said that doesn't come in. Why? Because the district court said it wasn't relevant because we're not going to look at their plans. Their plans don't matter. And a plan is the shared intent of the parties. The plan is the central question. Was there a plan to abandon? Did you ask for a closing argument? The district court just say no closing argument. We asked for a closing argument. The district court said no closing argument. Was there any other aspect of this trial that was truncated? So evidence was excluded including what you've just described. Closing argument was rejected. What else occurred that you feel didn't allow you to present your case as to shared intent? Anything? There was, we had to put on a very lengthy offer proof. That would be the biggest issue would be the exclusion of evidence and the inability to introduce corroborating evidence to bolster our client's credibility. But you said you made a lengthy offer of proof? We did. The bench trial? Yes, Your Honor. It was a bench trial. And the judge heard it? The judge heard it and reiterated that plans, that the parties' plans. And declared that he wasn't considering it, it wasn't influenced by it. But he heard it? Yes. All right. Clarify that for me. He accepted the offer of proof for appellate review or he accepted and then therefore essentially was aware of the facts for his own decision. What was the premise for accepting it? For our review, in case he's wrong? That was the premise of accepting the offer of proof. Now, in October 2016, Mr. Cortez employed the assistance of a family friend, an attorney, to negotiate the divorce settlement. And as part of that divorce settlement, they continued what they had been doing since before their arrival in Paraguay. And that was to get Lisa and the child an apartment in the United States. And that friend told her, you can leave at any time. And that friend, according to Mr. Cortez's mother's testimony, had discussions with them while those negotiations were going on. And that shows a continuing consistent pattern that this family was in a state of flux. There was no meeting of the minds. There was no shared intent. Instead, they were taking it step by step, day by day, trying to figure out what they were going to do next. And there is continuing course of conduct from September 2015 through October 2016, where the parties were negotiating for Lisa to remain in the United States. All right. Thank you, counsel. Good morning. My name is Lauren Waddell, and I represent Sebastian Cortez, the appellee in this case. When Judge Hoyt looked into the plan, when he was disregarding plans, he was disregarding plans that were unaccomplished. He was stating throughout the trial, and I remember, that plans unaccomplished are meaningless with regard to shared intent. That's a big problem for me. A plan, someone's future plan, would ever be accomplished. There were a lot of plans that were stated by Ms. Phillips. She was going to go possibly to California. I'm not talking about Ms. Phillips. The evidence is your client contacting realtors in California to get an apartment. And the district court, if I'm not mistaken, said, well, that's not true. He wasn't in California. Do you defend that as, is there any case law that would allow him to do that? So, I don't know if I understand your question. Okay. Here's the question. Berezowski, I thought we said the court's task, those are our words, are to look at future plans. Correct? Yes, Your Honor. Okay. Your client had a future plan to have a house in the United States, but the district court said, I won't consider that. That's not relevant. That, I don't see how you can square that with Berezowski. Yes. So, my client testified that he was looking into getting apartments in California. The parties met in California. There was a like to visit California. And that he was, in fact, looking at apartments, as this family has an apartment in Miami, apartment in Uruguay, to get an apartment in California for the family to visit. That does not have any, does not contradict his plan to move to Paraguay and reside in Paraguay. The reason I think Judge Hoyt said that that's not relevant is, A, it was before the time period that was relevant in this case. The move of the entire family in October 2015 until October 2016 when she came to Houston. Why, he said that, but where's the law that allows a district judge to say, this is the relevant time period to find shared intent? I think... What case in any circuit says you can carve out and freeze frame when you find the shared intent? I would think our law is very clear. You've got to look at any statement the two of them are making about where they intend to live. And I think the judge did consider all the testimony, but decided what they, in fact, did is move to Paraguay. How did the judge consider the testimony if the judge said it's not relevant because she doesn't, she isn't there now? It's a future plan. How did he consider it if he said he didn't consider it? Well, I think that he was saying that she can say whatever she wanted to do, but actions speak louder than words. And what they actually did is they moved to Paraguay. And so when the court was, you know, now looking at that, he did not find it relevant as to what she said she was going to do, but what did she actually... So if two parents say, we're going to go on a visit to Buenos Aires, the district court can say, we're not going to consider the other statements. We'll come back in a week. The case... But what the trial judge, he's sitting in a bench trial. You're not excluding evidence from a jury's consideration. He hears the evidence. He says, I don't think that's relevant. Now, is that exclusion of evidence, or he is determining this does not persuade me? I mean, I just don't think he says that really, in fact, I don't think, when he says it's not relevant, it doesn't bear on this in his view, and he's not going to, given the other evidence that's there. I'm not sure what the... In terms of exclusion, in terms of relevance. Now, if he said, I'm going to, I will not consider that, or is he saying, I just don't find that, I don't find that relevant, it's shorthand to say that's not going anywhere with me. Right. Either way, I think that even if that evidence came in, it's not harmful. It wouldn't have changed Judge Hoyt's conclusion that the parties intended to establish the child's residence in Paraguay. Judge Hoyt thought... That's a harmlessness argument. Your answer isn't that the district court said that's not persuasive. You're saying, if he was wrong to exclude it, even from his consideration, it's harmless. That's your argument? Well, I think, A, it's not persuasive, but B, even if the court does find that there was possible error... Did he provide a line of inquiry into that, or did he hear all that and just say, I don't, that's just not relevant? Which was it? Well, he definitely heard a lot of testimony on that, and so, I mean, it was definitely discussed in the trial about this inquiry into possibly going into California. But I think it is relevant that, although there was correspondence, it ended in September 4th, 2015, was the last correspondence that Mr. Cartes made to any realtor in California. The parties moved in October 2015 and resided in Paraguay until October 2016. There was nothing offered in that period that Ms. Phillips was looking, continued looking in California. There was some evidence... The district court discredited her. So for me, clear error review, if there's no legal error, is just looking at him. But is it true that if we're just, even if we accept the district court's span of time, right before they come in October 2015, isn't he contacting divorce attorneys? In September 2015, he did a consultation... Okay, that's... Had an argument. That's fine. Yes, sir. Then, he testifies on the stand that, I wasn't thinking of when or whether my wife and child or where they would live. That's his testimony. They were definitely... That's in October. That was very early October. Okay. So now let's go to the end of the span. He drives them to the airport and consents to the child leaving. Is that correct? Yes, sir. So given that, his statements before, after they've come, and when they leave, don't reflect any notion that the intent is to have the child in Paraguay. Why isn't it incredibly important to know about future plans, his own, where he's contacting realtors back in the U.S.? And yet the court says, I won't look at that future plan. So I think what Judge Hoyt honed on was the unaccomplished plan. Because he did look at the parties were there from February 2015 in Paraguay to August 2015, making plans. Mr. Cortez actually moved to Paraguay and the family was joining them for an extended stay to check out the situation in Paraguay and if that would be an appropriate place for this child. That is when Mr. Cortez's mom made a promise and said, if you decide to move your child to Paraguay, I will build a home for you. And they looked into employment. My client was working steadily there. In fact, Ms. Phillips actually worked there for a short period of time for the family. When they came back, they made plans. My client moved the rest of his belongings per their plan to move to Paraguay. Yes, the parties got into an argument, but they reconciled. In fact, when they moved in October 2015 to Paraguay, the house was under construction. The parties slept in the same bedroom as married couples. And they continued to reside there. In December of 2015, the child is baptized and Ms. Phillips chooses the godfather who resides in South America. Those are relocation factors. And that's getting into a third circuit test that we haven't embraced. So I assert that the facts scenario cover both. They covered both shared intent and settled purpose. The actions, you know, the parties disagreed in the trial, whether they agreed or not to make Paraguay their permanent habitual residence. If you look at what the parties did, it does support that they had an agreement to move this child, relocate this child to a new country. And that was Paraguay. They looked into it. They made ongoing plans. And then they actually put their plan into fruition. Did she ever describe Paraguay as home or not? When you heard me asking opposing counsel that. I know, I'm not sure, Your Honor. There is a very extensive, and I'll point the court to P69. Appellant picks out a few statements out of context that my client decided to move to Paraguay and that, you know, he affirms that he affected that. If you read the entire P69, you see that she even says, I want the child to be with you or I would have left a long time ago. She goes through and talks about how she was struggling. She's thought about it a million times, all the benefits the child has in Paraguay. And, you know, to move back is more, more was a focus on her and they have a discussion about that. And so to say that she didn't intend to live there. In fact, she did. She assessed the situation before she moved there and what kind of situation this little girl would have in Paraguay. Then she moved and it was so good. Despite the marital conflict, she stayed and chose for the child to stay. And yes, she got a boyfriend in January of 2016 and made 12 trips to Buenos Aires to visit this man without this child, leaving this child in Paraguay with his family. Whether these two people are well behaved, he had his own difficulties, right? So absolutely relevant to shared intent that each of them had a huge amount of distraction. Absolutely. And the court did look throughout this party's marriage. They had some separations and they'd get back together. And they had discord. And it wasn't a traditional in the sense of they were living in the same house, but they were living on the same property. They were living in different buildings on Mr. Cortez's mother's property in Paraguay. Bottom line is we're reviewing for clear air only as to shared intent. Yes, Your Honor. What about her claim that there was a legal error and conflicts with Larrabee? Did they have, how many residences did they have throughout this period, about a two year span of time? How many apartments around did they have? They had quite a few. They had, I think like, they originally met in California. So they had a place to live in California. I know they moved to Houston. And then they were in Miami for a short period of time, staying at Ms. Cortez's place in Miami. And he went through treatment there. Then they came back to Houston, had another place. And then before my client's last rehab, she had her own place, this Bancroft apartment, which appellant relies on heavily in her argument. Multiple residences doesn't really answer too much of the question about what's habitual. Yes. Yes. So Judge Hoyt cited in his memorandum opinion and order, this court applies the majority approach to determining habitual residence. And that is stated in the Larrabee case. It begins with the parent's intent. And the child's experience is not ignored. But greater weight is given to the parent's intent for the child to abandon the residence. When parties disagree as to whether both parents intended for the child to abandon the habitual residence, it's the last shared intent. And once that shared intent is abandoned and a new residence is established, the court analyzes then the acclamation or the settled purpose. Appellant contends that Judge Hoyt didn't, in fact, do this analysis. But we disagree. If you look at Judge Hoyt's opinion on pages 14 through 17, he specifically discusses the analysis. On page 15, it specifically noted the threshold test of abandonment and that it set out in Larrabee. And he found that the last shared intent was for the child's habitual residence to be Paraguay. And beyond a preponderance of the evidence, established that Paraguay was the last habitual residence prior to removal. It's implicit in Judge Hoyt's reasoning that if he found a new habitual residence, then he, in fact, found that the parties abandoned the U.S. as the habitual residence of this child. He applied the correct standard. He's familiar. He was involved in the Berezowski case. He knows Larrabee. He quoted Larrabee. And the fact that he looks at facts that could go into acclamation also go into shared intent. What they did before planning and actually accomplishing their plan by moving to Paraguay shows that these parties chose to abandon the U.S. and acquire habitual residence in Paraguay. You think it's insignificant that he consented to the departure of the two? Is that because the meeting of the minds occurred earlier? No, it's not. It wasn't. He didn't agree or consent or acquiesce. I thought he signed an order of consent. No. No. All he did, Your Honor, so when Ms. Phillips last entered Paraguay with the child, she had a diplomatic passport. All she had when she was leaving was a U.S. passport. So the immigration services, it red-flagged it. Why is she going out with a U.S. passport? My client's mother, Sara Cortez, actually had the child's Paraguayan diplomatic passport. She was in Miami at the time. So she asked Sebastian to go and tell the authorities at the airport that she would, as soon as she returned, come to the airport and show that she, in fact, has a diplomatic passport of the child. And that is all he agreed to. Before she left, he went to the authorities. He went to the actual police authorities. The day after he went to the police authorities, he went to the central authority to file a Hague application in Paraguay within days of her leaving. He did not consent for this child to change her residence to the United States of America. He consented— How does this family, they're U.S. citizens, how are they diplomats of Paraguay? Does the record answer that? Yes, Your Honor. So my client is the nephew of the current president of Paraguay. So they were able, through family ties, to get diplomatic passports. And Ms. Phillips used the diplomatic passport for her and the child quite often in her travels. Family members of the president all get diplomatic passports? I'm not quite sure how that all works, Your Honor, but I knew that that is how they got one. I'm guessing there's perks that come with being president in all countries, but— Probably. So, Your Best, if you were asked to pinpoint when the meeting of minds to live in Paraguay was, what month of the year 2015 would you say the district court thought that meeting of minds had been shown? So I don't—so I—my position is that on October 18, 2015, they had a meeting of the minds to change this child's residence to Paraguay. You can also—there's authority that says Ruez in, I think, the 11th Circuit in— You're saying when they actually fly in. When they actually fly in. But there is authority that says that there can be a temporary intent, and as they're there, that can—it can evolve during the stay. I'm saying that it happened when they moved because they had been planning to move. They had been planning for this for almost the majority of 2015. When they actually moved, they stay in the same— They stay in the same— The trouble when you try to pinpoint it, though, is you have exhibit evidence showing he's contacting divorce attorneys in that exact period, and then you have him on the stand saying, I didn't know where they were going to live at that point. In September, I know, and the volatility of the marriage, they're kind of—they fight, and they get back together. That has been historically this—these parties' situation. So they reconciled. My client testified about that. I'm just trying to be precise. There certainly wasn't reconciling at that moment. It's much later when she's saying Paraguay's nice. Well, I mean, she chose to go to Paraguay in October of 2015, stay in the same room as her husband, move with the child, travel with Ms. Cartes, the name— Her actions. Yes, her actions. And that's what I think the judge really focused on. He did discredit Ms. Phillips. Well, the district judge said he just didn't believe Phillips. He didn't find her credible in any respect, and he accepted the opposite testimony. He did, Judge. In fact, in his opinion, he cites 11 inconsistencies in her statements and evidence. Also, when she testified, she specifically testified she did not speak Spanish, and we impeached her in trial. We had text messages where she was texting back and forth in Spanish, and we had an audio recording where she was speaking fluently in Spanish for over 30 minutes. Her credibility was definitely attacked in the trial court, and the trial court notes, he specifically says in his order, I find the facts, the testimony of Ms. Phillips unpersuasive and unreliable. Based on her courtroom behavior, her manner of her testimony, and her actions about disputed periods, testimony and inferences that logically flow from it, coupled with her conduct, support the court's finding that her testimony was unreliable. Credibility is assessed by the trial court, who are the eyes and ears of this court. He sat through three days of trial, saw the witnesses face-to-face, and made a credibility finding. And his findings should be given great deference by this court. The trial court applied the correct legal standard. He specifically quoted Larbee. He specifically looked if they abandoned. And just because he didn't expressly in his findings say that they abandoned the United States of America, he did find that they had shared intent to establish the habitual residence in Paraguay. And his analysis included the finding that they abandoned the United States of America. The record supports that the parties formulated an intent to establish Paraguay as a child's residence. And the determination that the child's habitual residence is Paraguay should be affirmed. And this court's finding is plausible in light of the record as a whole. If you look at the facts, the actions of the parties corroborate my client, Ms. Sebastian's, story and account of what happened. They had planned and evaluated the opportunity. They actually moved. And despite marital discord, and despite Ms. Phillips finding a new man and pursuing other life dreams, there were definitely the intent to allow the child to stay. And I think that's where Appellant's reply brief is weak. They focused on Lisa's actions and what she wants to do. She might go here. She might go to Buenos Aires. But the child was residing in Paraguay. It was her habitual residence. And if you looked at all the facts, they point that direction that the record is well supported. And Judge Hoyt's ruling should be affirmed. Judge, I know I have a little bit less than a minute, but I'll give them a little time. You don't have to use it. Pardon me? You don't have to use it. You want to? No, sir. I will give it back to the court. Thank you very much. Thank you. Bottom. The date of October. I'm sorry. What was her age? They're both in their early 20s, mid to early 20s at that time. The issue with October 18, 2015, the date of the alleged move, when Ms. Phillips and the child arrived in Paraguay, is that even Mr. Cortez's own mother testified at trial that when they arrived, they were still fighting and hadn't reconciled. Did they quickly shack up and start staying in the same room together? Yeah, they did. But that lasted moments and there was no reconciliation. Mr. Cortez admitted in his testimony at trial that they never reconciled between the periods of September 2015, when he told her he was going to divorce her, in October 2016. The date is also problematic because Mr. Cortez's date seems to change and the facts seem to change depending on which court he's speaking to. He told the Paraguayan court in his application for the Hague return that the child had been living in Paraguay since September 2015. He told the district court that the child had been living in Paraguay since September 2015. He stated in his interrogatories that the child had been living in Paraguay since September 2015. And in his deposition, he stated he tried to explain this discrepancy, the fact that the child was not even present in Paraguay in September 2015. The difficulty though is these discrepancies, both people were very unstable, but the district court was pretty pronounced in its conclusion as to who to believe. But the problem is that with all of these discrepancies, there's no evidence of a meeting of the minds. And in October 2015, Mr. Cortez's own mom says that on that date, the parties had not reconciled when they arrived. I'm not sure the reconciliation between the two of them necessarily answers the question of the habitual residents themselves. They came back to the only one place in the world where they had a stable existence and a very prominent family of South America, with a prominent home and all of those kind of things. And that's where they took the baby. And then they're fighting among themselves. That doesn't necessarily tell me anything that what they were understanding was the best place for that child to be. Were they going to be hauled off to an Argentine boyfriend in California or some other place? I mean, in other words, I'm suggesting to you only that the trial judges might got to make those kind of decisions. I certainly couldn't make them from here. You're a very fine advocate. But that's one of the difficulties I have with the case is the one resting place in the world is Paraguay for these flying birds. And your honor, before that, the child was habitually residing in Texas. That both parties stipulated to that on the record. That we don't try child. We don't. We're not. We're enjoying not to get into the child custody issues and a convention issue. And it takes a lot of discipline not to look through to where that child ought to be. It does. And the fact of this family's resources and the fact that they had homes all over the place. That's his family. That's Mr. Cortez's family. Ms. Phillips was divorcing from that family. Mr. Cortez may keep apartments all over the place, but Ms. Phillips was separating herself. She was trying to reach a settlement negotiation with this family so that she could keep a home. We're just deciding which court system makes the decision. Well, notably, Mr. Cortez filed for divorce in Texas in February 2016 when Ms. Phillips and the child were already in Paraguay. And he states in his petition to the Texas court that Ms. Phillips had been residing, had been a resident of Texas for the prior six months. Residency under Texas law requires intent. And so you have these conflicting statements. Is the uncle still president? He is. He is. He is still president. So this issue would be decided in the courts in Paraguay if we affirm? If you affirm, then yes, custody would be decided in Paraguay. Now, you also have, in addition, you have, again, the repeated history of the fact that this family was talking about not just Ms. Phillips, but all of their text messages and emails are constantly referencing Ms. Phillips and the child getting an apartment in the United States once her lease expired. All right. Thank you, counsel. Your time has expired. Thank you very much.